# Miller's Estate:

*Decedents' estates—Claim for services—Uncle and niece—Clerical and housekeeping services—Evidence.*

.A claim by a niece against her deceased uncle's estate for an amount over $2,000 for clerical and housekeeping services during a number of years, will be disallowed, where the evidence as to an alleged contract for such services is based upon the declarations of the decedent, and is vague and indefinite, and the evidence as to the services rendered· showed that the claimant had written only a few letters, and had performed at intervals only a few trifling household ·duties.

Argued Oct. 7, 1908.    Appeal, No. 163, Oct. T., 1908, by

Martha A. Shirley, from decree of O. C. Armstrong Co., June T., 1907, No. 31, sustaining exceptions to auditor's report in Estate of Robert Miller, deceased.   Before MITCHELL, C. J., FELL, BROWN; MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Exceptions to report of J. R. Leason, Esq., auditor.

From the record it appeared that the auditor allowed the claim of Mrs. Martha A. Shirley against the estate for $1,728 for services.

. Various exceptions were filed to this allowance.

PATTON, P. J., sustained the exceptions, filing the following opinion:

The above exceptions all go to the allowance by the auditor of $1,728 to Mrs. Martha Shirley for services rendered to the decedent.

As the auditor admitted a large amount of irrelevant testimony, and heard incompetent witnesses, we labor under great difficulty to separate the wheat from the chaff; but believe that justice can be reached, and this tedious litigation ended by undertaking to do so, rather than refer the matter back-again to the auditor.

There can be no doubt that Martha Shirley, the claimant, was incompetent to testify against the estate of the deceased, and that her husband, John T. Shirley, on account of the identity of interest of husband and wife, when one of them was incompetent to testify because of interest, was also incompetent.   Therefore, their testimony should have been refused by the auditor and not considered by him.

The undisputed facts are that Robert Miller died July 7, 1904, being about seventy-eight or seventy-nine years old, unmarried, and without issue, leaving to survive him only collateral heirs, no closer than nephews and nieces.   For many years prior to his death he had lived with a sister, who died in May, 1904.

The testator was one of a type found in every community, poor in his youth, and through close economy during his entire

life, had acquired a competency; but at the same time had acquired habits that caused mental pain equal almost to physical suffering when compelled to part with a dollar. The testimony shows that he was exceedingly careful in contracting obligations, and equally careful in promptly discharging them.

Thus viewing the decedent and his surroundings, we will consider the claim of Mrs. Shirley. It seems to have been first presented before the auditor on February 17, 1908, and reads as follows:

"Robert Miller to Mrs. Martha A. Shirley, Dr., July 7, 1904. To services as clerk and assistant housekeeper for and during the past six years, at the rate of $20 per month, $1,440.00."

The important and material testimony to support the contract, is substantially as follows:

Miss Lizzie Moorhead: "I am a sister of Mrs. Shirley. In June, 1895, my uncle asked Mrs. Shirley if she would accept money and be paid for services of doing his writing, and looking after him and his sister in general. He wanted to feel at all times at liberty to come and ask her anything, and have her do anything for him, and if she would accept money he would be at liberty to do it; that she should put her bill into his estate; that he wanted her to get this money in a lump; that it would be more good to her that way; he wanted her to be paid and well paid, and to put her bill in big enough, and she agreed to do it. I heard this altogether half a dozen times, the last time two weeks before his death; he said he wanted her to be paid and her bill to be put in big enough, the day he took sick he said he never paid her anything, he said he wanted to hold her to her contract." Witness also testified to the claimant writing letters for the deceased, and doing some housework for him, and that her services would be worth $25.00 per month. She wrote to Mr. Maher, the lawyer at Indiana, and about the phosphate business, and to his relatives.

Mrs. Harriet Updegraph testified that she saw Mrs. Shirley read and write letters, and do household work for Mr. Miller.

J. T. Drake: "Miller told me about one and a half years before he died that Mrs. Shirley did all his writing for him."

Mrs. Harvey Holmes: "An assistant postmistress. As far as

I know, Mrs. Shirley did his correspondence for him. Saw her write for him once, and knew her handwriting on the envelopes."

Mrs. Isabella Woods: "Am a sister of Mrs. Shirley. He told me he had made an arrangement with her to put in a bill after his death for the pay for writing she did; that he never paid her anything, and that he was a great trouble to her; that he wanted her to put it in big enough; that he wanted her well paid; she was to attend to him and do his writing, and attend to him in case of sickness; she wrote letters for him most every day; he said he had cut her out of his will, but he would put her in again; she is to put in a bill for her services. I want her paid and well paid for all she has done for me; this was in June before his death. $1.00 per day would be small compensation; she was there almost every day; she brought home curtains, household clothes, tablecloths, etc., and washed them."

Mrs. H. S. Gephart: "I came to Miller's house first week in March, 1904; heard Robert tell his sister that Mrs. Shirley ought to be paid; that her and I have made an agreement that we are going to wait until after my death, and she is going to put in a bill after my death; he spoke about that frequently. I know of Mrs. Shirley writing letters for him. On the first day of July he said Martha, have you put that down? I want you to be paid and well paid for all the trouble I have given you or may hereafter give you."

The testimony on the part of the defense was entirely to show that the claimant did not render the services claimed for. A. G. Williams, one of the parties to whom it was alleged letters were written by the claimant for the deceased, testified that in the ten years immediately prior to the death of Miller, he had received but three letters from him; one in his own handwriting, two in the handwriting of a lady. Charles Wilcox, secretary of the Keystone Building & Loan Association, produced all the letters written by Miller to it from 1898 to 1904. None of them were in the handwriting of Mrs. Shirley. E. S. Ralston testified that he wrote a number of letters for Miller from August, 1896, to the fall of 1899. Harry Miller testified that he wrote letters for Robert Miller—business letters and letters to friends.

Daniel Singer says he wrote letters for Miller during five or six years before his death; he came to my house to get me to write letters; wrote about the phosphate business; sometimes he paid me for writing them. A. M. Johnston testified that he wrote letters for Mr. Miller. Mrs. Eddinger testified that she wrote letters for Mr. Miller in 1899, also received letters from him; they were not in the handwriting of Mrs. Shirley; these letters were from 1899 up until nearly the time of his death, oftener than every two or three months. George M. Hill, Esq., testifies he wrote letters for Miller; that Mrs. Shirley was jointly interested with Mr. Miller in the property in regard to which letters were written to Jack & Taylor, and Mr. Maher; and that his (Miller's) business was such that it did not require much letter writing.

On the conclusion of the testimony, to wit: May 1, 1908, Mrs. Shirley amended her claim to run from July, 1895, to the date of the death of Robert Miller, thereby increasing the amount of her claim from $1,440 to $2,160.

The auditor allowed her to recover at the rate of $16.00 per month, from July 7, 1895 to July 7, 1904, $1,728.

A careful reading and consideration of the testimony convinces us that the claim of Mrs. Shirley is wholly without merit, and falls within the class of cases the Supreme Court have repeatedly said that courts should hold with a tight rein. We search the record in vain for any substantial service rendered by the claimant. It is true, she wrote some letters for her uncle when he was too old to write them for himself, and that she washed some curtains and napkins, and did some trifling household duties for him, and her aged aunt. But this was only what is done every day by relatives without any hope or desire of pay, but through affection, sympathy, or an effort to secure compensation by a legacy. As to the latter, the efforts of Mrs. Shirley were not without success. She was not mentioned in the will of February 16, 1894, but by the codicil of January 31, 1899, she was given a legacy of $500, and by the codicil of February 18, 1899, to the heirs of Mary J. Moorhead, the auditor awarded her $441.09.

The testimony on the part of the estate shows conclusively

that she wrote but few letters for the deceased; that the ones that were written, were short, and would take but a few moments of time, and some of them in regard to matters in which she was jointly interested with Robert Miller.

As to work done as "assistant housekeeper," there is no evidence of anything done by her that would justify compensation. Her sisters are very willing witnesses, and we search in vain their testimony to show any substantial service rendered. Mrs. Gephart was there from May 5, 1904 to July 7, 1904, the. time these old people were in dire distress, and during a period for which Mrs. Shirley is awarded compensation, and when, if ever, she should have gone to their assistance. Mrs. Gephart says: "I did all the work, from feeding the horse to cleaning up Mr. Miller. I did everything that was to be done, taking care of him, feeding him, washed his clothes; there was no other nurse or domestic there. Mr. Ralston would come down, but would go right out again. One day I had to ask Mrs. Shirley to come up to help to change him. Mrs. Gephart is called as a witness for Mrs. Shirley, and is asked what services she rendered. The only one narrated is that she wrote some letters. Nor are we satisfied that the alleged contract will stand the legal test, so often applied to cases of this character, although there can be no doubt that if we take as verity the testimony of all the witnesses in regard to it, and disregard the circumstances surrounding it, that it is established. "But in civil cases, as well as criminal, a verdict may well be founded on circumstances alone, and these often lead to a conclusion more satisfactory than direct evidence:" 1 Greenleaf on Evidence (15th ed.), sec. 14.

We must also bear in mind that the claimant's case, as to a face to face contract, rests upon the recollection of a witness as to a contract alleged to have been made fourteen years before she gave her testimony, that she was not particularly interested in it, and also allowing for the danger of mistake, the misapprehension of the witness, her interest and bias, the improbability of her story, the liability of Miller to misuse words or not express his meaning clearly; the rule of law that admissions should be received with great caution, and are not of

that substantial character upon which should be based the rights of property.

Claims against the estates of decedents, resting upon oral testimony of declarations and admissions, are very dangerous, and not to be favored by the courts: Pollock v. Ray, 85 Pa. 428.

Claims of this nature against dead men's estates, resting entirely in parol, based largely upon loose declarations presented years after the service was rendered, and when the lips of the party principally interested are closed in death, require the closest and most careful scrutiny to prevent injustice from being done. We cannot too often repeat the cautions we have so frequently uttered upon this subject: Wall's Appeal, 111 Pa. 460.

The contract, as related by the witnesses, is so improbable, and so much in variance with the actions and conduct of the deceased during his entire lifetime, we cannot help but conclude that they (the witnesses) either did not understand him, or else have forgotten important facts of his declarations. That a man so painfully close as Robert Miller, and so prompt in the discharge of his debts, however small, would declare that he wanted Mrs. Shirley to "put in a bill big enough," that he wanted "her well paid," and then to allow that bill to accumulate to an amount exceeding $2,000, is inconceivable.

Hence, we are constrained to find that the decedent did not enter into such a contract with the claimant as she can legally enforce; and that she did not render any services except those rendered through affection, sympathy or hopes of a legacy, and her claim is disallowed.

*Error assigned* was decree sustaining exceptions to auditor's report.

*H. L. Golden* and *R. A. McCullough*, for appellant.

*R. L. Ralston*, with him *Calvin Rayburn*, for appellee.

Per Curiam, November 2, 1908:

The decree is affirmed on the opinion of the court below on the exceptions to the report of the auditor.